## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|   |   |   |
|---|---|---|
| **MICHAEL JESSE MEDEIROS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **20-10147-FDS** |
| **v.** | ) | |
| | ) | |
| **ANDREW SAUL, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION
## FOR ORDER REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S
## MOTION FOR ORDER AFFIRMING COMMISSIONER'S DECISION

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying an application for supplemental security income ("SSI") benefits.

Plaintiff Michael Jesse Medeiros, Jr. alleges that he became disabled on January 1, 2005, after

various impairments rendered him unable to work.  He submitted medical records indicating that

he suffers from various ailments, including depression, bipolar disorder, and anxiety disorder.

He now disputes the Commissioner's holding that he is not "disabled" within the meaning of the

Social Security Act.

Pending before the Court is Medeiros's appeal and the Commissioner's motion to affirm.

For the reasons stated below, Medeiros's motion to reverse and remand will be granted and the

Commissioner's motion to affirm will be denied.

I.    **Background**

The following is a summary of the evidence as set forth in the administrative record

("A.R.").

A.    **Education and Occupational History**

Michael Jesse Medeiros, Jr. was born on October 18, 1981, and is currently 39 years old.

(A.R. 207).  He was 23 years old at the alleged onset of his disability on January 1, 2005.  (*Id.* at

207, 232).[1]

Medeiros has a high-school education.  (*Id.* at 238).  From 1998 until 2003, he was

employed as a grill chef and shift manager at a fast-food restaurant, but has not engaged in

meaningful employment since that time.  (*Id.* at 224, 238, 244).

B.    **Medical History**

Medeiros alleges that he is unable to work due to various mental-health impairments,

including depression, bipolar disorder, and anxiety disorder.  (*Id.* at 237).[2]

Mohammad Munir, M.D., a psychiatrist, has been treating Medeiros since 2009.  (*Id.* at

242).  He was treating Medeiros as of the date of Medeiros's SSI application in 2017, and

continued treating him thereafter.  (*Id.*).

Dr. Munir's records of his examinations of Medeiros between February 2016 and April

2017 indicate that he showed either "no serious mental status abnormalities" or was "euthymic

---

[1] The Application Summary for Supplemental Security Income in the administrative record states that
Medeiros filed his application on May 18, 2017.  (*Id.* at 207).  However, the ALJ stated that he "protectively" filed
his application on April 24, 2017, and the Initial Disability Determination and Reconsideration Disability
Determination also stated that the application date was April 24, 2017.  (*Id.* at 11, 103, 116).  The date a written
statement is received, mailed or signed will "protect" the plaintiffs filing date—that is, it will be used as the
application filing date—if the conditions under 20 CFR § 416.340 are met.  Thus, it appears that Medeiros was
entitled to a protective filing date of April 24, 2017.

[2] Medeiros also alleged various physical impairments, including obesity, hypertension, and opioid
dependence.  (*Id.* at 237).  This opinion focuses on his alleged mental-health impairments only, because on appeal,
his contentions are based solely on those impairments.  (*See* Pl. Mem. at 2, 4-7).

with no signs of depression or manic process." (*Id.* at 465-92). Until August 1, 2016, Dr. Munir's records indicated diagnoses of bipolar disorder, not otherwise specified (active), anxiety disorder, not otherwise specified (active), and opioid abuse (active). (*Id.*). On August 1, 2016, after an examination, Dr. Munir determined that his "bipolar disorder, current episode mixed, mild" and "opioid abuse, uncomplicated" were in full remission, and his "anxiety disorder, unspecified" was in partial remission. (*Id.* at 476).

On April 17, 2017, Dr. Munir examined Medeiros, who reported that he was "feeling good," "coping with his stresses well," and "denie[d] feeling depressed, severely anxious, or experiencing mood swings." (*Id.* at 492). Dr. Munir noted that "his behavior has been stable and uneventful" and described his medical compliance as "good." (*Id.*). He further noted that Medeiros's mood was "euthymic with no signs of depression or manic process," and that his cognitive functioning was "intact and age appropriate and he is fully oriented." (*Id.*).

On May 15, 2017, Dr. Munir noted that Medeiros reported that he was "feeling good," "coping with his stresses well," and that he "denie[d] feeling depressed, severely anxious, or experiencing mood swings." (*Id.* at 494). Dr. Munir noted that "his behavior has been stable and uneventful" and described his medical compliance as "good." (*Id.*).

On May 23, 2017, Justin Thomas, P.A., took Medeiros's blood pressure, and noted that he was "regularly walk[ing]," and "play[ing] 'ball' 2-3 times a week." (*Id.* at 413). Medeiros reported emotional stress to Thomas, but told him that it "had to do with [a] significant other" and that he was "ok." (*Id.*). Thomas reported that he appeared well, was not in acute distress, and was pleasant. (*Id.* at 414).

On June 12, 2017, Dr. Munir noted that Medeiros showed no serious mental abnormalities.  (*Id.* at 496).  On July 11, 2017, Dr. Munir again examined him and noted that his mood "[was] euthymic with no signs of depression or elevation."  (*Id.* at 504).

On July 28, 2017, Dr. Harold Rosenblatt, M.D., examined Medeiros and noted that his mental status was "alert"; his orientation was "[times three]" as to his person, place and time; his thought content was within normal limits as to any suicidal or homicidal hallucinations or delusions; his thought process was logical; his mood was good; and his affect was "[a]ppropriate to content."  (*Id.* at 314-15).

On August 1, 2017, Dr. Neil Hadfield, M.D., examined Medeiros and noted that he was "alert and oriented to person, place and time," and had "a normal mood and affect" and "normal" behavior.  (*Id.* at 500-01).

On August 8, 2017, Dr. Munir noted that during their visit Medeiros had spoken about episodes of tearfulness, his brother's incarceration, and taking care of his four-month-old nephew.  (*Id.* at 506).  He also reported that Medeiros spoke of "high anxiety," "depressive symptoms," and "episodic" depressive moods, but that he showed "no serious mental status abnormalities."  (*Id.*).

On September 6, 2017, Dr. Munir noted that Medeiros had spoken about "stress related to [a] girlfriend and him taking care of her children."  (*Id.* at 529).  He described to him that he was experiencing "symptoms of anxiety. . . . [that are] increas[ing] in frequency or intensity," and that he was experiencing "depressive symptoms" and "racing" thoughts.  (*Id.*).  Dr. Munir's examination showed no serious mental status abnormalities, and "no signs of anxiety."  (*Id.*).

On October 3, 2017, Dr. Munir noted that Medeiros had said he was "al[]right" and was having "episodic" but "manageable" anxiety and that he had not had "any panic attacks,

nightmares, or flashbacks." (*Id.* at 534). Dr. Munir also noted that his behavior had been "stable" and his mood was "euthymic with no signs of depression or manic process." (*Id.*).

On October 31, 2017, Dr Munir noted that Medeiros reported that he was experiencing "high anxiety," and "depressive symptoms," and "motor restlessness associated with anxiety." He again noted that Medeiros mood was "euthymic with no signs of depression or manic process." (*Id.* at 537).

On November 29, 2017, Dr. Munir noted that Medeiros showed "no serious mental status abnormalities" but also noted that he said he was having "episodic high anxiety," "depressive symptoms," and "episodic" depressive moods. (*Id.* at 540). Also on November 29, Holly Faunce, R.N., met with Medeiros and administered a PHQ-9 depression assessment test. (*Id.* at 539). She recorded a score of 17, which indicated that he had moderately severe depression. (*Id.*).

On December 27, 2017, Nurse Faunce again administered a PHQ-9 depression assessment test. (*Id.* at 543). She noted that Medeiros scored 29, which indicated severe depression. She also noted that his behavior was "stable" and his medication compliance was "good." (*Id.*).

On January 25, 2018, Nurse Faunce administered another PHQ-9 depression assessment test. (*Id.*). She noted that he scored 11, which indicated moderate depression, and that his behavior was "stable," and his medication compliance was "good." (*Id.* at 544).

On February 26, 2018, Nurse Faunce noted that Medeiros's behavior was "stable and uneventful" and that his medication compliance was "good." (*Id.* at 548). Also on February 26, Dr. Munir noted that he reported that he was having "episodic mood instability," and "racing" thoughts. (*Id.* at 549). Dr. Munir also noted that he showed "no serious mental status

abnormalities" and that his behavior was "stable" and his medication compliance was "good." (*Id.*). However, in a second note from that day, Dr. Munir indicated that he presented as "friendly, distracted, communicative, anxious, unhappy[,] and tense." (*Id.* at 551). He noted that his speech was "rapid and loud"; his affect was "labile"; his mood was "mildly elevated and present[ed] as hypomanic"; his manner was "paranoid" and other signs of "paranoid process [were] present"; and there were signs of "anxiety." (*Id.*). He noted that his judgment and insight into problems "appeared fair," and that he did not verbalize any destructive thoughts. (*Id.*). They discussed mood stabilizers, and Dr. Munir renewed his prescriptions for Clonidine, Paxil, and Xanax, and started him on Lamictal. (*Id.* at 551-52).

On March 26, 2018, Dr. Munir noted that Medeiros appeared "irritable, wary, inattentive, distracted, communicative, casually groomed, anxious, unhappy and tense." (*Id.* at 553). He also noted that his speech was "pressured, and loud"; his affect was "inappropriate"; his mood was "labile[]"; he was "easily distractibl[e]," "irritable," "intrusive," "physically hyperactive[e]" and "overly talkative"; his manner was "paranoid" and other signs of "paranoid process [were] present"; and there were "signs of anxiety." (*Id.*). He further noted that his judgment and insight into problems "appeared fair," and he did not verbalize any destructive thoughts. (*Id.*). Medeiros's diagnoses remained the same, and Dr. Munir renewed the prescribed medications and increased the dose of Lamictal. (*Id.* at 553-54). Also on March 26, Nurse Faunce noted that his behavior was "stable" and his medication compliance was "good." (*Id.* at 561).

On April 25, 2018, Nurse Faunce administered a PHQ-9 depression test to Medeiros. His score was 16, which indicated moderately severe depression, and she noted that his behavior was "stable" and his medication compliance was "good." (*Id.* at 555).

Also on April 25, 2018, Dr. Munir noted that Medeiros appeared "friendly, wary, inattentive, communicative, casually groomed, anxious, unhappy and tense." (*Id.* at 557). He noted that his speech was "rapid[] and loud," and his affect was "inappropriate" and "labile." (*Id.*). He also noted that he did not appear to be "responding to internal stimuli" nor did he "verbalize any destructive thoughts," and that there were "no overt signs of psychosis," although there were "signs of anxiety." (*Id.*). His diagnoses remained the same, and Dr. Munir again continued his medications and again increased the dose of Lamictal. (*Id.*).

On May 23, 2018, Nurse Faunce met with Medeiros and noted that his behavior was "stable" and his medical compliance was "good." (*Id.* at 559).

On June 20, 2018, Dr. Munir noted that Medeiros said that he was "doing better emotionally" and "spoke about improvement in [his] affective state and [] ability to cop[e] with stresses." (*Id.* at 563). Dr. Munir also noted that he was compliant with his medications and tolerating them well, and that his behavior was "stable and uneventful." (*Id.*). He further noted that he showed "no serious mental status abnormalities." (*Id.*). His diagnoses remained the same, and Dr. Munir continued his medications. (*Id.*).

On July 17, 2018, Dr. Munir noted that Medeiros reported that his "frustration was low" and he had episodic irritability, anger, mood instability, high anxiety, and poor impulse control and auditory hallucinations. (*Id.* at 564). He noted that he appeared "angry, irritable, inattentive, distracted, communicative, anxious, unhappy and tense." (*Id.*). His speech was "pressured[] and loud"; his affect was "inappropriate" and "labile"; he "expresse[d] inappropriate anger"; he was "physical[ly] hyperactiv[e]"; and his manner was "paranoid" and "other signs of paranoid process [were] present." (*Id.*). His insight into problems and judgment were poor, and there

were signs of anxiety.  (*Id.*).  His diagnoses remained the same, but Dr. Munir decreased his

doses of Paxil, continued his prescription for Xanax, and increased his doses of Lamictal.  (*Id.*).

At some point, Dr. Munir referred Medeiros to Dr. James Cremins for a cognitive

evaluation, which took place on August 11, 2018.  (*Id.* at 565, 577).  Dr. Cremins noted that

Medeiros reported to him that he was "a mess physically and emotionally."  (*Id.* at 565).  He also

noted that he appeared "sad looking, downcast, attentive, communicative, casually groomed,

overweight, [] tense[,] and [] anxious."  (*Id.*).  He noted that he had normal speech, intact

language skills, signs of moderate depression, a sad demeanor, and that he appeared downcast

and near tears.  (*Id.*).  He further noted that he had denied suicidal ideas, his affect was blunted,

his associations were intact, and there were no apparent signs of hallucinations, elusions, bizarre

behaviors, or "other indicat[ions] of a psychotic process."  (*Id.*).  Dr. Cremins found that his

cognitive functioning was in the normal range, he was fully oriented, his thinking and thought

content appear[ed] appropriate.  (*Id.*).  He noted that "[t]here are signs of hyperactive and

attentional difficulties" but also that "[Medeiros] exhibits no signs of attentional or hyperactive

difficulties" and that "there were signs of anxiety" but also that "there are no signs of anxiety

apparent."  (*Id.*).  He noted that he denied experiencing any hallucinations or delusions.  (*Id.*).

Dr. Cremins administered him a Geriatric Depression screening and reported that he scored a 15,

indicating severe depression.  Medeiros also took a Beck Anxiety Inventory test—a self-

administered multiple-choice test—and scored a 54, indicating severe anxiety.  (*Id.*).

On August 20, 2018, Dr. Munir noted that Medeiros said he was "not doing well" and

reported a lack of motivation, intense anxiety, mood instability, paranoia and inattentiveness.

(*Id.* at 566).  Dr. Munir also noted that he said he was hearing voices but denie[d] command

hallucinations; and that his behavior was "stable and uneventful," and medication compliance

was "good";  that he appeared angry, irritable, wary, inattentive, distracted, anxious, unhappy

and tense; that his speech was "pressured[] and loud"; he was "excited" and "overtalkative"; his

affect was "inappropriate"; he was "fidgety"; "his paranoid process was in evidence"; he

expressed "delusional" and "paranoid" ideas; his behavior suggested that "auditory

hallucinations [were] being experienced"; and his manner was "paranoid" and "other signs of

paranoid process [were] present." (*Id.*).  He showed signs of anxiety, but did not verbalize any

destructive thoughts, and his insight into problems and judgment appeared fair.  (*Id.*).  Dr.

Munir's diagnoses remained the same.  (*Id.*).

### C.    Additional Medical Examinations or Opinions

On August 3, 2017, state agency psychologist John D. Chiampani, Ph.D., performed an

evaluation of Medeiros.  (*Id.* at 98).  Dr. Chiampani concluded that his ability to understand,

remember, or apply information was mildly limited; his ability to interact with others was

moderately limited; his ability to concentrate, persist, or maintain pace was mildly limited; and

his ability to adapt and manage himself was moderately limited.  (*Id.*).  Overall, he opined that

Medeiros "performs [activities of daily life] independently with stabilized mental status" and that

he can "complete routine tasks in a[] regular schedule with appropriate behavior."  (*Id.*).

Dr. Chiampani also performed a residual functional capacity assessment.  (*Id.* at 99-100).

As to Medeiros's social interactions, he concluded that he was moderately limited in the ability

to interact appropriately with the general public; moderately limited in the ability to accept

instructions and respond appropriately to criticism from supervisors; and moderately limited in

the ability to get along with coworkers or peers without distracting them or exhibiting behavioral

extremes.  (*Id.*).  As to his ability to adapt, Dr. Chiampani concluded that he was moderately

limited in the ability to respond appropriately to changes in the work setting; moderately limited

in the ability to be aware of normal hazards and take appropriate precautions; and moderately limited in the ability to set realistic goals or make plans independently of others.  (*Id.* at 100). Overall, he concluded that Medeiros could "carry out regular tasks in a daily schedule with appropriate social interaction."  (*Id.* at 100).

On October 9, 2017, state agency psychologist Dr. Joseph A. Whitehorn, Ph.D., performed an evaluation of Medeiros.  (*Id.* at 111-14).  He determined that Medeiros was limited in the same activities and to the same degree as Dr. Chiampani had previously determined.  (*Id.* at 111, 113).  He also noted that Medeiros's function report had alleged problems with concentration and focus and problems interacting with others.  (*Id.* at 111, 267-74).  In the "additional explanation" section of the psychiatric review technique assessment, he noted Dr. Munir's June 2017 report, in which Medeiros had reported feeling good and coping with stresses well; Dr. Munir's July 2017 report of stable behavior and no signs of depression; and his August 2017 episode of tearfulness, which Dr. Whitehorn said was "presumably related to incarceration of [his] brother."  He determined that Medeiros's mental state was "completely [within normal limits]."  (*Id.* at 111).  In the narrative form section of the "social interaction limitations" section of the RFC, he wrote:  "socially appropriate with [a] stabilized mental status; Hx [history of] mood swings with opioid abuse; anxiety."  (*Id.* at 113).  In the narrative form section of the adaptation limitations, he wrote:  "coping with mood swings, irritability and opioid abuse."  (*Id.*). Finally, in the "additional explanation" section of the RFC he wrote, "[t]his 35 yo claimant has stabilized mental status with five years of psychiatric service and medication management.  (*Id.*). He can carry out regular tasks in a daily schedule with appropriate social interaction."  (*Id.*).

Shortly before the administrative hearing, on September 20, 2018, Medeiros met with psychologist Dr. Herbert I. Rothfarb, Ph.D. for a psychodiagnostic interview.  (*Id.* at 577).  From

the record, it appears that he may have evaluated him at the request of Medeiros's lawyer. (*Id.* (letter from Dr. Rothfarb addressed to Medeiros's attorney); *id.* at 11 (explaining that the ALJ was admitting into the record certain evidence from Medeiros)). On October 2, 2018, Dr. Rothfarb reported that Medeiros presented as "a severely paranoid, depressed, irritable, disturbed, angry and dependent character who may, in fact, be psychotic." (*Id.*). He reported that Medeiros lives with his parents and opined that he "is not equipped to be hired for gainful employment and seemingly will need care and protection for the foreseeable future." (*Id.*)

In a psychological evaluation dated October 26, 2018, Dr. Rothfarb further reported diagnoses of major depressive disorder, recurrent with mood congruent psychotic features, panic disorder, generalized anxiety disorder, social anxiety disorder, borderline personality disorder, and borderline intellectual functioning. (*Id.* at 582-86). He assigned Medeiros a Global Assessment of Functioning ("GAF") score of 37, which he reported was "[the] highest GAF in the past year." (*Id.* at 586).[3] He found that Medeiros was prone to interpersonal misunderstandings, could not handle his own funds, and had a pattern of instability in interpersonal relationships, impulsivity, affective instability, and inappropriate intense anger. (*Id.*). Dr. Rothfarb concluded that he showed "mild to marked restrictions of activities of daily living and marked difficulties in maintaining effective and appropriate social functioning," and that he showed "repeated episodes of deterioration in work or work-like settings, which have caused him to withdraw from that situation if not to experience an exacerbation of signs and

---

[3] According to the Commissioner's memorandum, a GAF score between 31 and 40 is associated with "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed adult avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school." (Comm'r Mem. n.4 (quoting Diagnostic and Statistical Manual of Disorders, Fourth Edition (DSM-IV) 34 (4th Ed. 2000)).

symptoms." (*Id.*).  He further reported that he showed "deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner." (*Id.*).

      **D.**    **Procedural History**

On May 18, 2017, Medeiros applied for SSI benefits, alleging that he became disabled on January 1, 2005.  (*Id.* at 207).  The Commissioner denied his claim both initially on August 14, 2017, and upon reconsideration on October 16, 2017.  (*Id.* at 117-119, 123-125).  Thereafter, Medeiros filed a written request for a hearing on December 19, 2017.  (*Id.* at 126-28).  The hearing was held on October 5, 2018.  (*Id.* at 51-92).  Medeiros appeared and testified at the hearing.  (*Id.* at 52).  Kenneth Smith, a vocational expert, also testified at the hearing.  (*Id.*).

On January 3, 2019, the ALJ concluded that Medeiros was not disabled.  (*Id.* at 8).

Medeiros requested a review of the ALJ's decision.  (*Id.* at 1).  On November 26, 2019, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner.  (*Id.* at 1).  This appeal followed.

**II.**    **Analysis**

      **A.**    **Standard of Review**

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards,

and found facts based on the proper quantum of evidence." *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings. . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision. . . ."). Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision." *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D. Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed de novo. *Seavey*, 276 F.3d at 9.

**B.**     **Standard for Entitlement to SSI Benefits**

In order to qualify for SSI, the claimant must demonstrate that he or she is "disabled" within the meaning of the Social Security Act. 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition of "disabled" in the context of SSI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe enough to prevent the plaintiff from

performing not only past work, but any substantial gainful work existing in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

The Commissioner uses a sequential five-step process to evaluate whether a claimant is disabled. See *Mills v. Apfel*, 244 F.3d 1, 2 (1st Cir. 2001); C.F.R. § 416.920.  Those steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had. . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 416.920(a)(4).  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the vocational factors of the claimant's age, education, and work experience, to determine whether he or she can engage in any kind of substantial gainful work which exists in the national economy.  20 C.F.R. §§ 416.920(g), 416.960(c).

C.     **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the established five-step procedure set forth in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found Medeiros had not engaged in "substantial gainful activity since April 24, 2017."  (A.R. at 13).

At step two, the ALJ addressed the severity of Medeiros's impairments.  He concluded that he has the following severe impairments:  depression and anxiety.  (A.R. at 13).  Those impairments significantly limited his ability to perform basic work activities as required by SSR 85-28.  (*Id.*).[4]

At step three, the ALJ found that those severe impairments, or their combination, did not meet or medically equal the severity of the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 14).  The ALJ stated that Medeiros's depression and anxiety "considered singly and in combination do not meet or medically equal the criteria of listings 12.04 or listing 12.06" and noted that, "in making [that] finding he considered whether the 'paragraph B' criteria [were] satisfied."  (*Id.*).

"To satisfy the paragraph B criteria, [the] mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning."  20 C.F.R. Part 404, Subpart P, Appendix 1, 12.00 Mental Disorders.  Those four areas are: "understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself."  (*Id.*).

The ALJ concluded that the "paragraph B" criteria were not met because Medeiros had only a mild limitation for understanding, remembering, or applying information; a moderate limitation for interacting with others; a mild limitation for concentrating, persisting, or maintaining pace; and a moderate limitation for adapting or managing himself.  (A.R. 14, 15).  In

---

[4] The ALJ noted that while Medeiros also suffers from obesity, opiate dependence, hypertension, foot pain, and back pain, none of those conditions were severe impairments.  (A.R. at 13-14).  The ALJ came to that conclusion based on information indicating that Medeiros's hypertension was under control, his opiate dependence was in remission, his foot x-rays were normal, his back issues were the result of a sprain, and he played basketball two to three times a week.  (A.R. at 14).

addition, the ALJ found that he did not satisfy the "paragraph C" criteria because the "evidence fail[ed] to establish" that criteria.  (*Id.* at 15).

At step four, the ALJ determined that Medeiros did not have any past relevant work under 20 C.F.R. § 416.965.  (*Id.* at 20); *see also* 20 C.F.R. § 416.965 ("We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled applies.").

After consideration of the entire record, the ALJ concluded that Medeiros had the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations:  he can have occasional, brief superficial interactions with the general public and coworkers, and he is able to adapt and respond to occasional simple, routine changes in the work setting and routines.  (A.R. 16).

In making that finding, the ALJ followed a two-step process.  (*Id.* at 16).  First, he considered whether there were underlying medically determinable physical or mental impairments—that is, impairments that could be shown by medically acceptable clinical or laboratory diagnostic techniques—that could reasonably be expected to produce the Medeiros's pain or other symptoms.  (*Id.*).  Second, he evaluated the intensity, persistence, and limiting effects of those symptoms to determine the extent to which they limited the claimant's functional limitations.  (*Id.*).  For that purpose, whenever statements about that intensity, persistence, and limiting effect were not substantiated by objective medical evidence, he considered other evidence in the record to determine if the symptoms limited the ability to do work-related activities.  (*Id.*).

At the first step of the two-step process, he determined that Medeiros's medically determinable impairments could reasonably be expected to cause the physical and psychological

symptoms he testified to experiencing.  (*Id.* at 17).  However, at the second step of the two-step

process, he found that Medeiros's statements about the intensity, persistence, and limiting effects

of his symptoms were not consistent with the medical evidence of record.  (*Id.*).

In making those determinations, the ALJ stated that he did not defer to or give any

specific evidentiary weight, including controlling weight, to any prior administrative medical

findings or medical opinions.  (*Id.* at 1620).  He noted that he found Dr. Whitehorn's opinion that

Medeiros has no exertional limitations and moderate limitations interacting with others and in

adapting and managing himself persuasive because "it was consistent with the medical evidence

of record and treatment notes of Dr. Munir, which contain evidence of normal mental status

examinations when the claimant is compl[ia]nt with taking his medications."  (*Id.* at 20 ("I find []

the DDS consultant's opinion. . . persuasive.") (citing A.R., Ex. 3A)).  He did not find the

opinion of Dr. Rothfarb (that Medeiros was severely depressed, paranoid, irritable, angry, and

dependent and not equipped for gainful employment) persuasive, because "[Dr. Rothfarb]

evaluated the claimant one time and his opinion is inconsistent with the claimant's treating

longtime psychiatrist, [and] [Dr.] Munir's treatment notes, which contain evidence of normal

mental status examinations when the claimant is compliant with taking his medications."  (*Id.*).

Overall, he found that the residual functional capacity assessment was supported by the medical

evidence of record, by Medeiros's testimony that he had never been psychiatrically hospitalized

and was currently taking psychiatric medications, and by his activities of living.  (*Id.*).

At step five, the ALJ considered Medeiros's age, education, work experience, and RFC.

Taking all of those factors into account, the ALJ found that a significant number of jobs existed

in the national economy that he could perform.  (*Id.* at 20-21); *see also* 20 C.F.R. §§ 416.969 and

416.969(a).  To determine the extent to which Medeiros's nonexertional limitations impeded his

ability to perform unskilled work at all exertional levels, he asked the vocational expert whether

jobs existed in the national economy for an individual with the claimant's age, education, work

experience, and RFC.  (A.R. at 21).  The vocational expert found that a person with Medeiros's

characteristics could work in representative occupations such as a janitor, a kitchen helper, or a

cleaner.  (*Id.*).  The ALJ concluded that after considering his characteristics, he could make a

successful adjustment to work that exists in significant numbers in the national economy, and

that Medeiros was not disabled within the meaning of the Social Security Act.  (*Id.*).

      **D.**     **Plaintiff's Objections**

     Medeiros raises two main objections to the ALJ's determination that he is not disabled:

(1) that the ALJ's residual capacity finding omitted three of his limitations and (2) that the ALJ

failed to address his worsening symptoms toward the end of 2017 and throughout 2018.

       **1.**     **The Alleged Failure to Address All of Medeiros's Limitations in the RFC**

     Medeiros first contends that the ALJ's finding is not supported by substantial evidence

because the ALJ did not expressly address three of the limitations addressed by Dr. Whitehorn,

even though the ALJ stated that he found Dr. Whitehorn's opinions persuasive.[5]

     Generally, it is "appropriate for the ALJ to give partial weight to the opinion evidence

from the state agency consultants," even if such opinions did not consider every medical record,

in the absence of contrary opinion evidence or any opinions closer in time to plaintiff's hearing.

*Myers v. Berryhill*, 2019 WL 3976017, at *17 (D. Mass. Aug. 21, 2019) (affirming ALJ's

reliance on state agency consultants' RFC assessment, and rejecting plaintiff's argument for

---

[5] Dr. Whitehorn evaluated Medeiros on October 9, 2017.  (A.R. 113-14).  As noted, Medeiros contends that the ALJ failed to address his worsening symptoms between December 2017 and continuing through October 2018.

reversal based on new medical records because plaintiff did not show reasonable probability that the ALJ's decision would have been different had he considered the records).

In his RFC assessment, Dr. Whitehorn concluded that Medeiros was moderately limited in his ability to interact appropriately with the general public; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; and moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (A.R. at 113).  Dr. Whitehorn also concluded that he was moderately limited in his ability to respond appropriately to changes in the work setting; moderately limited in his ability to be aware of normal hazards and take appropriate precautions; and moderately limited in his ability to set realistic goals or make plans independently of others.  (*Id.*).

The ALJ concluded that Medeiros has the following nonexertional limitations:  he can have occasional, brief superficial interactions with the general public and coworkers, and he is able to adapt and respond to occasional simple, routine changes in the work setting and routines. (A.R. 16).  Thus, Medeiros contends that the ALJ failed to account for his moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors; his moderate limitation in the ability to be aware of normal hazards and take appropriate precautions; and his moderate limitation in the ability to set realistic goals or make plans independently of others.

The premise of that contention is flawed for two principal reasons.  First, "the RFC set forth in narrative form in Section III of the commissioner's Mental Residual Functional Capacity Assessment form ('MRFC Form'), rather than [the] checkboxes contained either in the separate Psychiatric Review Technique Form ('PRTF') or in section I of the MRFC Form, constitutes the *official RFC assessment*."  *Swift v. Astrue*, 2009 WL 902067, at *3 (Mar. 31, 2009) (emphasis

added) (citing Social Security Administration Program Operation Manual System § DI 24510.060(B)(2)(a) & (4)(a), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060).[6]   Dr. Whitehorn's narrative explanation of the "social interaction limitations" section of the RFC stated:  "socially appropriate with [a] stabilized mental status; Hx [history] mood swings with opioid abuse; anxiety."  (A.R. 113).  In the narrative form section of the adaptation limitations, he wrote: "coping with mood swings, irritability and opioid abuse."  (*Id.*).  In the additional explanation section of the RFC he wrote:  "this 35 yo claimant has stabilized mental status with five years of psychiatric service and medication management.  He can carry out regular tasks in a daily schedule with appropriate social interaction."  (*Id.*).  Those sections constituted the official RFC assessment.

In addition, the limitations that Medeiros contends the ALJ failed to include in his RFC are specific limitations falling within broader categories of "social interaction limitations" and "adaptation limitations."  (*Id.* at 113).  Thus, the ALJ's conclusion that Medeiros had nonexertional limitations that included the ability to have occasional, brief superficial *interactions* with the general public and coworkers, and the ability to *adapt* and respond to occasional simple, routine changes in the work setting and routines, was likely meant to encompass his more specific limitations that Dr. Whitehorn had identified within those broad areas.

---

[6] There were no section headings or checkboxes in Dr. Whitehorn's evaluation sheet.  (A.R 104-15). However, in other respects, the form he used appeared to correspond to the form described in DI 24510.060 Mental Residual Functional Capacity Assessment and the form discussed in *Astrue*.  (*Id.*).

Furthermore, the second hypothetical the ALJ posed to the VE demonstrated an understanding of the more specific limitations expressed in Dr. Whitehorn's evaluation.[7]  The ALJ asked whether a person could perform work in the national economy if, in addition to the nonexertional limitations about which he had previously asked the VE—Medeiros's ability to have occasional, brief superficial interactions with the general public and coworkers, and to adapt and respond to occasional simple, routine changes in the work setting and routines—that person would also "be able to understand and remember simple instructions, [] able to sustain attention, persistence, and pace, and perform simple tasks for two hours at a time over an eight-hour day, 40-hour week [inaudible] the customary breaks[?]"  (A.R. 90).  Thus, the ALJ appeared to consider Medeiros's specific limitation in the ability to accept instructions that fell within the broader category of "social interaction" limitations.

In summary, the ALJ's finding will not be reversed based on the ALJ's failure to expressly address certain limitations noted by Dr. Whitehorn.

### 2.    The Alleged Failure to Address Medeiros's Worsening Symptoms

Medeiros also contends that the ALJ's finding is not supported by substantial evidence because that finding failed to address reports from Dr. Rothfarb, Dr. Munir, and Nurse Faunce concerning his worsening symptoms in late 2017 and throughout 2018.[8]

An ALJ is not required to discuss "every piece of evidence in the record that favors appellant."  *Santiago v. Secretary of Health and Human Servs.*, 1995 WL 30568, at *4 (1st Cir. Jan. 25, 1995); *Sousa v. Astrue*, 783 F. Supp. 2d 226, 234 (D. Mass. 2011) ("The hearing officer

---

[7] Medeiros also contends that Dr. Whitehorn's opinion presumed that he had a stabilized mental status.  (Pl. Mem. at 7).  However, Dr. Whitehorn *concluded* that Medeiros had a stabilized mental status based on his review of the medical evidence, which is different than *presuming* his opinion on it.

[8] Medeiros also contends that examinations in 2012, 2014, and 2015 revealed worsening symptoms.  (Pl. Mem. at 4).  Because his contentions are essentially the same with respect to those examinations as they are with respect to more recent evidence, the Court will focus on the alleged failure to address the more recent evidence.

is not required to—nor could he reasonably—discuss every piece of evidence in the record.");

*N.L.R.B. v. Beverly Enterprises-Massachusetts*, 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can

consider all the evidence without directly addressing in his written decision every piece of

evidence submitted by a party.  Nor must an ALJ make 'explicit credibility findings' as to each

bit of conflicting testimony, as long as his factual findings as a whole show that he 'implicitly

resolve[d]' such conflicts.").  Likewise, the ALJ's decision need not address pieces of evidence

that are cumulative of evidence already discussed, or that fail to support claimant's position.

*Dube v. Astrue*, 781 F. Supp. 2d 27, 35 (D.N.H. 2011).

However, the ALJ cannot simply ignore contradictory evidence altogether.  *Id.*  Put

differently, an ALJ cannot "parse [the] medical evidence, accepting favorable evidence and

ignoring unfavorable evidence 'without offering a principled reason' as to why he is doing so."

*Id.* at 35-36 (citing *Brunel v. Barnhardt*, 2002 WL 24311, at *9 (D.N.H. Jan. 7, 2002) (reversing

and remanding where the ALJ had discussed one opinion by an examiner, but had failed to

discuss another contradictory opinion from that same examiner).

The ALJ addressed Dr. Rothfarb's opinion, which was favorable to Medeiros, and

explained why he had decided to reject that opinion.  As summarized by the ALJ, Dr. Rothfarb

had opined that Medeiros was "severely depressed, paranoid, irritable, angry and dependent and

was not equipped for gainful employment. . . and [had] [a] global assessment of functioning [of]

37."  (A.R. 20 (citing *id.*, Exs. 16F & 18F).  The ALJ explained that he did not find those

opinions persuasive for the following reasons:

> [Dr. Rothfarb] evaluated the claimant one time[,] and his opinion [was]
> inconsistent with [Medeiros'] treating longtime psychiatrist, [and Dr.] Munir's
> treatment notes, which contain evidence of normal mental status examinations
> when the claimant is compliant with taking his medications.  Dr. Munir's
> treatment notes also indicate that the claimant was highly functioning and that he
> did part-time work, walked[,] and played basketball.  [The ALJ] asked him about

working part-time.  He said he made up the story to get out of attending a group.
Much of [the claimant's] testimony was contrary to the evidence.

(*Id.*).[9]

The ALJ failed to address, however, any of the treatment notes of Dr. Munir and Nurse

Faunce indicating Medeiros's worsening symptoms in late 2017 through August 2018, nor did he

provide a reason he was ignoring them.  Specifically, Nurse Faunce reported that Medeiros

scored a 29 on a PHQ-9 depression assessment test on December 27, 2017, indicating that he

suffered from severe depression.  (A.R. 543).  That score improved to 11, indicating moderate

depression, on January 25, 2018.  (*Id.* at 544).  However, on February 26, 2018, in a second

report from that day, Dr. Munir noted that Medeiros presented as "friendly, distracted,

communicative, anxious, unhappy[,] and tense."  (*Id.* at 551).  He reported that his speech was

"rapid and loud"; his affect was "labile"; his mood was "mildly elevated and present[ed] as

hypomanic;" his manner was "paranoid" and other signs of "paranoid process [were] present";

and there were signs of "anxiety."  (*Id.*).  His examinations from March 26 and April 25, 2018,

revealed similar behavior.  (*Id.* at 553, 557).

Dr. Munir's July 17, 2018 report showed a further deterioration:  where previously he had

found that Medeiros's insight into problems and judgment were "fair," he concluded at that time

that they were "poor."  (*Id.* at 564).  The next month, Dr. Munir concluded that his judgment and

insight into problems once again appeared "fair," but noted similar symptoms from other

---

[9] The ALJ's duty to articulate "specific reasons" for weighting a medical opinion are relaxed when the opinion is that of a consultative examiner such as Dr. Rothfarb.  *See Cruz v. Colvin*, WL 1068860, at \*11 (D.R.I. Feb. 18, 2016) ("A[s] long as the report is considered, courts are reluctant to find that an ALJ's failure to articulate or explain the weight given to the report of a consultative examiner necessarily amounts to error, never mind reversible error."), adopted by WL 1069059 (D.R.I. Mar. 17, 2016).

examinations from this period, and also that his behavior suggested that "auditory hallucinations [were] being experienced."  (*Id.* at 566).

The ALJ's decision summarized 13 progress notes from Dr. Munir, but summarized none of the progress notes between December 2017 and August 2018 that showed worsening symptoms.  (A.R. 17-19).  And although he summarized a June 2018 report that showed that Medeiros briefly seemed to be doing better, he otherwise skipped over all of the progress notes in question.  (*Id.*).

The ALJ relied on Dr. Munir's progress notes throughout much of his decision, and thus, under the circumstances, it is difficult to conclude that the notes in question were not potentially significant pieces of evidence.  And although the ALJ explained why he was ignoring Dr. Rothfarb's opinions, he did not explain why he was ignoring Dr. Munir's opinions, which were documented over a period of many months, rather than a "one-time" evaluation.

There are several possibilities as to why the ALJ failed to address Dr. Munir's and Nurse Faunce's progress notes that showed worsening symptoms.  For example, because he summarized the June 2018 report that showed that Medeiros briefly improved, it is possible that he thought that the record overall was more consistent with Dr. Munir's progress notes that showed stabilized behavior.  A second possibility arises from the ALJ's conclusion that the RFC was supported because of the "medical evidence of record as a whole, especially the objective clinical findings contained in the claimant's treating medical records, such as *normal mental status examinations*, and indications in the claimant's treating records that his psychiatric symptoms are stable *when he is compliant* with taking his psychiatric medications."  (A.R. 20) (emphasis added).  The ALJ may have concluded that, because Dr. Munir began treating Medeiros with medications and increased the dose upon his worsening symptoms, with time,

those medications would help Medeiros to stabilize once again.  (*See, e.g.*, *id.* at 551-52, 553-54, 557).  Finally, the ALJ may have determined that because Dr. Munir still noted some signs from this period that offset the severity of Medeiros's conditions, such as a report on March 26, 2018, that "his behavior was "stable" and his medical compliance was "good," (*id.* at 566), such progress notes were not inconsistent with the overall finding. (*See, e.g.*, *id.* at 549, 566).

But the ALJ did not include any statements to those effects in his decision.  And in absence of an indication of a "principled reason" explaining why he failed to address the progress notes indicating worsening symptoms, it is unclear whether he actually considered them in determining Medeiros's RFC.  They suggested a substantially more severe impairment than he identified, and thus, should have been specifically addressed, even if to reject that suggestion.  The decision will therefore be reversed, and the matter will be remanded for further proceedings.[10]  The Court of course expresses no view as to the weight, if any, to be given to that evidence.

## III.   Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED.

---

[10] There is no merit, however, to Medeiros's contention that the ALJ "plac[ed] excessive weight on normal examinations that occurred prior to the time that benefits would be payable to Medeiros." (Pl. Mem. at 6).  The earliest month for which [the SSA] can pay [a claimant] benefits is the month following the month [he or she] filed the application." 20 C.F.R. § 416.335.  As noted, Medeiros filed his application on April 24, 2017.

Consistent with 20 C.F.R. § 416.935 the ALJ was permitted to consider Medeiros's complete medical history which is defined as "the records of your medical source(s) covering *at least the 12 months preceding the month in which you file your application*." 20 C.F.R. § 416.935 (emphasis added).

Furthermore, the ALJ did in fact consider a significant amount of evidence from the relevant time period. He referenced Dr. Munir's treatment records from April 2017 through August 2018, Dr Whitehorn's findings from October 2017, and Dr. Rothfarb's findings from October 2018, among other records.  (A.R. 19-20).

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  March 29, 2021                         Chief Judge, United States District Court